UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MATTHEW BROWN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 22-30068-FDS |
| ) | |
| UNIVERSITY OF MASSACHUSETTS ) | |
| AMHERST, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS**

**SAYLOR, C.J.**

This is an action involving a university's response to a reported case of sexual harassment of a graduate student. Plaintiff Matthew Brown has filed suit against the University of Massachusetts Amherst ("UMass") alleging that it violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, by failing to investigate his complaint that a fellow student was sexually harassing him and by failing to provide support or protection. He is proceeding *pro se*.

UMass has moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, the motion to dismiss will be denied.

**I.   Background**

The following facts are drawn from the complaint and exhibits attached to the

complaint.[1]

### A. Factual Background

The University of Massachusetts Amherst is a university located in Amherst, Massachusetts. (Compl. at 2). Matthew Brown is a former UMass graduate student. (Compl. Ex. 3 at 2).[2]

On February 19, 2019, Brown sent an e-mail to the Dean of Students Office with the subject line, "Harassment issues with another student." (Compl. Ex. 1 at 2). In the e-mail, he wrote:

> To the Dean's Office:
>
> I am graduate student here at UMass Amherst in the School of Public Policy's MPPA program. I feel that I've been harassed, possibly sexually harassed, by a fellow student in my cohort, [CD]. I will be referring to CD as "they/them" in this email, because that is their preferred pronoun.
>
> **Harassment**
>
> I was placed in a group project with CD last semester that required me to meet with them outside of class. We developed a friendship, and we frequently met in Machmer W-31 (the SPP student office) to work. On a few occasions, when I arrived at the office CD was alone. They would shut the door and sort of compulsively start talking to me about sex. This included describing their genitals in detail (they are transgender), describing their history as a sex worker, and describing their master/submissive relationship with a man in town. They described the sexual acts they do in the master/slave relationship, which I found repulsive.
>
> I never consented to these conversations, but I didn't leave the room either. Generally I was caught off guard and remained silent. I tried to give them signals that I was not comfortable, but they didn't seem to be getting them. I felt I had to work with them for the group project, and hoped that they would knock it off, so I

---

[1] Two of the exhibits are communications for settlement purposes from Brown's former lawyers to UMass. (*See* Compl. Ex. 3; Compl. Ex. 4). For purposes of this motion, the Court construes the factual allegations in those letters as allegations in the *pro se* complaint.

[2] According to the complaint, Brown attended UMass to obtain a Master's in Public Policy and Administration. (Compl. Ex. 3 at 2). He began the program in the fall of 2018 and completed it in the fall of 2020. (*Id.*).

> continued meeting with them for the rest of the semester as required.
>
> Their frequent use of sexual language continued throughout the semester. When the semester ended I was able to get some distance from CD, avoiding them for about 40 days. However, I have been placed in a group project with them again this semester, and my strategy of evading them is failing.
>
> I reach out to the Dean's Office now to hopefully discuss this situation, and help orient me toward the next steps I should take to succeed in my program.
>
> **Academic Dishonesty**
>
> There is another unfortunate layer to our relationship. CD has been hounding me to help them cheat since midterms in October. They asked me to give them test answers, completed homework, and to take their tests for them. They asked me to take my phone into our economics final, take photographs of it, and send it to them. This trend continues this semester.
>
> I always say "no," but they don't seem to get the message, because they just keep asking me for things they know I cannot give them. Unfortunately, when I do say "no" they sometimes get hostile with me. This included spreading false gossip about me to other students when they were angry with me. For example, they told another male student in my cohort that I was sexually attracted to him. My wife witnessed CD speaking about this particular incident, and she wrote a letter of concern documenting it, which I have attached.
>
> I have also attached some emails and a Facebook conversation documenting CD's repeated requests for academic material that we are not supposed to share. They are careful of what they say over email, but they are referring to what I believe is attempted cheating in each of them.
>
> I am sorry to make first contact with your office on such a somber note, but I am concerned about my interactions with CD and am unsure how to proceed. I had hoped to avoid them after the conclusion of last semester, but now that I cannot do that, I am unsure what to do. Thank you for any help you can provide.

(*Id.* at 2-3). Less than 24 hours later, Dean Appel-Silbaugh responded to him with the following e-mail:

> Thank you for the emails regarding your interactions with CD. I have asked my Associate Dean of Students for Conduct & Compliance to review the information and determine next steps. Given much of this is related to course work we might refer the matter to Academic Affairs for academic honesty review. Regardless, either myself or one of my colleagues will be in touch with you.

(*Id.* at 2). Brown replied to her e-mail that same day:

3

> Thank you!  I hope to discuss this soon.  My main concern is the harassment/sexual harassment component of their interactions with me.
>
> I also want to let you know that I delicately brought up some of these concerns to the professor who placed me into a group with CD this semester, and she seemed unsympathetic.  Given that I suffer from a registered anxiety disorder, and that I have been scheduled to work intensively with CD for the rest of the semester (including 1.5 hours unsupervised tonight), I elected to drop the course for now.  I hope to discuss that as well.

(*Id.* at 4).

According to the complaint, Brown's case was assigned to Dean Landeta-Burdick, who met with him to discuss the matter on February 28, 2019. (Compl. Ex. 3 at 4). The complaint asserts that she told him that he needed to enforce stricter boundaries with CD and tell CD to leave him alone. (*Id.*).

On March 9, Brown allegedly sent CD an e-mail instructing CD not to have any further contact with him. (*Id.*).

On March 19, Dean Landeta-Burdick sent Brown the following e-mail:

> I am following up from our meeting on February 28, 2019 to check-in to see how you are doing.  I also wanted to inform you that the student we discussed has met with a staff member within my office and the concerns you raised in our meeting were addressed.  Additionally, the student was directed not to speak with you moving forward.
>
> During our meeting you mentioned working with your faculty to get an independent study to make up for the course you withdrew from, were you able to get confirmation on a faculty member who would be your advisor?
>
> As I shared during our meeting, if you would like assistance connecting to campus resources/services, please do not hesitate to contact my office at 413-545-2684.

(Compl. Ex. 2 at 3).

On March 22, Dean Landeta-Burdick telephoned Brown. (Compl. Ex. 4 at 2). According to the complaint, Brown—who stepped out of a statistics class he had with CD to answer her call—was unable to have a proper discussion at that time because he was in a public

hallway.  (*Id.*).

> Brown next contacted Dean Landeta-Burdick on May 1:
>
> Hi Dean Landeta-Burdick,
>
> I wanted to follow up with you on our last conversation, and check in on the status of removing the DR from my record.
>
> Unfortunately CD did not leave me alone after our last conversation, and continued to bother me off and on for the rest of the semester.  I had a very difficult time with them on our third Beacon Hill trip, they showed up to a social event that I planned, and they generally continued to try to interact with me however possible in class.  As a result I missed out on experiences with my peers and had a very uncomfortable time finishing my semester.  Hopefully now that they are graduating, I won't have any more courses with them and that should be the end of that.
>
> However, I remain concerned about the class I withdrew from.  Have you had a chance to follow up on any of that?  I would primarily like to get the DR removed from my record.  I had a 100% grade and perfect attendance in the course when I withdrew.  Ideally I would also like to not have to pay for the course again next year when I register for it.

(*See* Compl. Ex. 2 at 2).  Unbeknown to Brown, Dean Landeta-Burdick had gone on a leave.  He did not receive a reply, so he e-mailed the Dean of Students Office on May 13:

> Hello DOSO,
>
> I am following up on my prior email sent to you on 5/1/19, to which I did not receive a reply.
>
> I had a harassment issue with another student last semester.  I reached out to your office earlier in the year and my case was assigned to Dean Landeta-Burdick.  Dean Burdick agreed to help me, but did not finish doing so.  She was to get back to me about mitigating my academic losses, but did not and then went on leave.  I am now asking anyone from your office to help me, so that I can put this behind me and get on with my education.
>
> At this point, all I am asking for is the DR to be removed from my record and to not have to pay for the course again in the Spring when I have to re-register for it.  I believe that is reasonable.
>
> Can someone please assist me?  I want to put this behind me and move on.  This experience was painful.

(*Id.*).

It appears that Brown did not receive a response to that email. According to the complaint, Brown's issues with CD delayed the completion of his master's degree by seven months. (*See* Compl. Ex. 3 at 10; Ex. 4 at 4).

### B. Procedural Background

Plaintiff filed the complaint in this action on May 24, 2022, asserting a violation of Title IX. According to the complaint, defendant's failure to provide support or protection from CD's misconduct had a negative impact on his academic performance, his social connections with other students, and his ability to take advantage of networking opportunities. (Compl. Ex. 3 at 9). He seeks $150,000 in damages and "justice in the form of a formal apology." (Compl. at 4).

Defendant has moved to dismiss the complaint for failure to state a claim upon which relief can be granted. Plaintiff has not filed an opposition to that motion.

### II. Standard of Review

To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable

legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Where, as here, a motion to dismiss is filed against a *pro se* litigant, any document filed by the *pro se* party is "to be liberally construed," and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). However, while *pro se* complaints "are accorded 'an extra degree of solicitude' . . . even a *pro se* plaintiff is required 'to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *Wright v. Town of Southbridge*, 2009 WL 415506, at *2 (D. Mass. Jan. 15, 2009) (quoting *Adams v. Stephenson*, 116 F.3d 464, at *1 (1st Cir. 1997) (per curiam)).

**III.     Analysis**

    **A.     Title IX**

The complaint asserts a claim for a violation of Title IX of the Education Amendments of 1972. Subject to certain exceptions not applicable here, the relevant provision of Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Under Title IX, "a recipient of funding from the United States Department of Education may be liable for damages if 'its deliberate indifference [to peer-on-peer sexual harassment] "subjects" its students to harassment.'" *Porto v. Town of Tewksbury*, 488 F.3d 67, 72 (1st Cir. 2007) (alteration in original) (quoting *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644 (1999)). "To succeed in bringing such a 'deliberate indifference'

claim, a plaintiff must show that (1) 'he or she was subject to "severe, pervasive, and objectively offensive" sexual harassment'; (2) 'the harassment caused the plaintiff to be deprived of educational opportunities or benefits'; (3) the funding recipient was aware of such harassment; (4) the harassment occurred 'in [the funding recipient's] programs or activities'; and (5) the funding recipient's response, or lack thereof, to the harassment was 'clearly unreasonable.'" *See Doe v. Brown Univ.*, 896 F.3d 127, 130 (1st Cir. 2018) (alteration in original) (quoting *Porto*, 488 F.3d at 72-73). The legal standard for claims of sexual harassment does not vary according to the gender or sexual orientation of the alleged victim or that of the alleged perpetrator.

Defendant has moved to dismiss the complaint on the grounds that (1) its response was not clearly unreasonable and (2) the alleged sexual harassment was not severe, pervasive, and objectively offensive. For the reasons set forth below, the Court concludes that the allegations of the complaint are sufficiently plausible to survive a motion to dismiss.

### 1. Whether Defendant's Response Was "Clearly Unreasonable"

"The bar for a showing of deliberate indifference under Title IX is a high one." *Doe v. Wentworth Inst. of Tech., Inc.*, 2022 WL 1912883, at *4 (D. Mass. June 3, 2022). "Significantly, the Supreme Court has described deliberate indifference as 'an official decision by [the person with notice] not to remedy the violation.'" *Id.* (alteration in original) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

As noted, in cases of student-on-student sexual harassment, a school may be found to be deliberately indifferent only where its response "is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Furthermore, to prove liability, a plaintiff must show that the school's deliberate indifference subjected him or her to harassment or made him or her vulnerable to it. *Id.* at 645. If an educational institution takes "timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment." *Wills v. Brown Univ.*,

184 F.3d 20, 26 (1st Cir. 1999). But if earlier measures have proved inadequate to prevent further harassment, a school "may be required to take further steps to avoid new liability." *Id.*; *see also Porto*, 488 F.3d at 74 (stating that a school may be found deliberately indifferent "where it had notice of the sexual harassment" and "failed to take additional reasonable measures after it learned that its initial remedies were ineffective").

However, "Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, [or] to craft perfect solutions . . . ." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 174 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009). It is sufficient if a school takes "timely and reasonable" measures to address the harassment, even if those measures fall short of perfection. *See Wills*, 184 F.3d at 26.

In substance, the complaint asserts that defendant violated plaintiff's rights under Title IX by responding with deliberate indifference to his reports of sexual harassment. Specifically, the complaint contends that defendant did not adequately respond to his report of sexual harassment because it failed to complete a formal Title IX investigation and failed to provide him with adequate protection as the other student continued to harass him.

According to the complaint, plaintiff first notified the Dean of Students Office that he was being "possibly sexually harassed" on February 19, 2019. (Compl. Ex. 1 at 2-3; Compl. at 6). Within 24 hours, Dean Appel-Silbaugh personally responded to his e-mail and indicated that the Associate Dean of Students for Conduct and Compliance would review the information, and that either she or one of her colleagues would be in touch regarding next steps. (Compl. Ex. 1 at 2). Plaintiff thanked her and indicated that his "main concern is the harassment/sexual harassment component of [CD's] interactions with me." (*Id.* at 4).

On February 28, plaintiff met with Dean Landeta-Burdick—who had been assigned to the

matter—to discuss the matter. (Compl. Ex. 3 at 4). She allegedly told him that he needed to enforce stricter boundaries with CD and tell CD to leave him alone. (*Id.*). In addition, on March 19, she informed him by e-mail that a staff member within the Dean of Students Office had met with CD and directed CD not to speak with him moving forward. (Compl. Ex. 2 at 3).

Had the matter ended there, the Court might well conclude that UMass did not display deliberate indifference to his complaint. And that could be true even if the school's efforts were not successful, and the harassment did not immediately cease. As a general matter, "[t]o avoid Title IX liability, an educational institution must act reasonably to prevent future harassment; it need not succeed in doing so." *Fitzgerald*, 504 F.3d at 175; *see also Porto*, 488 F.3d at 74 ("[T]he fact that measures designed to stop harassment prove later to be ineffective does not establish that the steps taken were clearly unreasonable in light of the circumstances known by [a defendant] at the time."); *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 9 (1st Cir. 2020) ("[F]unding recipients are not required to have perfect foresight or manage all student interactions expertly.").

According to the complaint, however, the harassment thereafter "escalated into more public settings and new stalking behaviors." (Compl. at 6). On May 1, 2019, five weeks after his telephone call with Dean Landeta-Burdick, plaintiff emailed her to say that CD had "continued to bother [him] off and on for the rest of the semester," adding, "Hopefully now that they are graduating, I won't have any more courses with them and that should be the end of that." (*See* Compl. Ex. 2 at 2). The complaint also alleges that "[plaintiff] and his wife repeatedly followed up with the Dean of Students Office to state that CD was continuing to harass and stalk [him]." (Compl. Ex. 3 at 9). However, the complaint does not list any of the dates on which those conversations allegedly occurred. And in his May 13 follow-up e-mail,

plaintiff stated that the dean "was to get back to me about mitigating my academic losses." (Compl. Ex. 2 at 2). Plaintiff did not receive responses to those emails, and eventually he suffered a delay in obtaining his graduate degree due to the harassment.

It is true that "a claim that the school system could or should have done more is insufficient to establish deliberate indifference." *Porto*, 488 F.3d at 73. Nonetheless, the Court is not prepared to find, at this stage, that the complaint does not plausibly allege a claim of deliberate indifference. According to the complaint, at least, UMass responded promptly to his original email of February 19, and engaged with him and CD over the ensuing several weeks. However, the complaint also alleges that after May 1, and after Dean Landeta-Burdick went on leave, the school did nothing to respond to his subsequent complaints of continued harassment. Whether or not that is true—and the Court has no way to assess it—it is sufficient to make out a plausible claim of deliberate indifference.

### 2. Whether the Alleged Sexual Harassment Was Severe, Pervasive, and Objectively Offensive

"[S]evere, pervasive, and objectively offensive" sexual harassment "effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. "Whether gender-oriented conduct rises to the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectations, and relationships.'" *Id.* at 651 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)); *see also id.* at 653 ("The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity."). "Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment." *Id.* at 653.

Here, the complaint plausibly alleges that CD subjected plaintiff to "severe, pervasive,

and objectively offensive" sexual harassment. According to the complaint, when plaintiff met with CD on campus for assigned coursework, "CD repeatedly described their genitals to [plaintiff]; made gestures to imitate themselves masturbating; spoke in explicit detail about sadomasochistic sexual encounters; [and] degraded [plaintiff] using sexual language . . . ." (Compl. Ex. 3 at 8).[3] In addition, the complaint asserts that when plaintiff refused to help CD cheat, CD spread false rumors about him, including that he was sexually attracted to another male student. (*See* Compl. Ex. 1 at 3).

The complaint further alleges that plaintiff withdrew from a course in which he was assigned to work together with CD because "[t]he prospect of having to further interact with CD was too much to handle." (Compl. Ex. 3 at 3-4). In addition, after plaintiff met with Dean Landeta-Burdick and instructed CD to leave him alone, CD allegedly "began stalking him on and off campus . . . and harass[ing] him at SPP networking events." (*Id.* at 4). "Eventually," the complaint asserts, plaintiff "stopped attending all social events and lost connection with the majority of his cohort." (*Id.*).

Thus, under the circumstances, the complaint plausibly alleges that plaintiff was subject to sexual harassment that effectively barred his access to the benefits of his academic program. Accordingly, the motion to dismiss will be denied.

## IV.   Conclusion

For the foregoing reasons, defendant's motion to dismiss is DENIED.

---

[3] For example, CD allegedly told plaintiff that "he was small, he was weak, he had womanly eyes, he had a 'twink body,' and he was gay." (Compl. Ex. 3 at 3).

**So Ordered.**

                                                  /s/ F. Dennis Saylor IV
                                                  F. Dennis Saylor IV
Dated:  March 6, 2023                       Chief Judge, United States District Court